Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company,<br><br>      Plaintiff,<br><br>   vs.<br><br>SWEETENER PRODUCTS, INC.; and DOES 1-10, inclusive,<br><br>      Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

## I.      INTRODUCTION

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendant SWEETENER PRODUCTS, INC. ("Defendant") for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

**Notice Letter**

2.      On or about August 17, 2024, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency

("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendant, including a copy delivered to Defendant by certified mail, to Facility Manager, Sweetener Products, 1150 Thurman Street, Lodi, California ("the facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.    A copy of Plaintiff's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.    More than sixty days have passed since Plaintiff's Notice was properly and lawfully served on Defendant, the State Board, and the Regional and National EPA Administrators.

5.    Plaintiff is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

6.    This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II. PARTIES

### Plaintiff

7.    Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS is an environmental membership group organized under the laws of the State of California.

### Defendant

8.    Plaintiff is informed and believes, and on such information and belief alleges, that Defendant SWEETENER PRODUCTS, INC., doing business as Sweetener Products, located at 1150 Thurman Street, in Lodi, California, is a California corporation in good standing with the California Secretary of State.

9.    Plaintiff is informed and believes, and on such information and belief alleges, that Defendant Sweetener Products, Inc. is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the facility.

### III.  JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

11.     Venue is proper because Defendant resides in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

### IV.  ARTICLE III STANDING

12.     Plaintiff's organizational purpose is the protection, preservation and enhancement of the rivers, creeks, streams, lakes and oceans (and their tributaries) in California.

13.     Plaintiff's organizational purpose and mission is accomplished through enforcement of the provisions of the Federal Clean Water Act and California's Industrial General Permit, in seeking redress against Industrial Dischargers who violate the CWA by failing to comply with all standard conditions of the Industrial General Permit.

14.     Plaintiff's associational members volunteer their resources to join EDEN's organizational purpose and mission.

15.     Plaintiff's associational members reside throughout Northern California.  Some of EDEN's members reside, work and/or recreate near the Mokelumne River, a tributary of the Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for Defendant's storm water run-off), and use those waters and their watersheds for kayaking, canoeing, cycling, recreation, duck hunting, sportfishing, swimming, hiking, bird watching, photography and nature walks.  Their use and enjoyment of these natural resources has been and continues to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA.

16.     Plaintiff has Article III standing as an association to bring this suit against Defendant, as at least one of EDEN's current members is experiencing an ongoing, concrete, and particularized injury fairly traceable to Defendant's violations of the CWA and Industrial General Permit, which likely can be redressed by a judicial decision granting Plaintiff the injunctive relief requested herein.

17.     The aesthetic and recreational interests of the individual associational members of Plaintiff with Article III standing have been adversely impacted by Defendant's failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA, as delineated herein.

18.     Plaintiff's associational members who qualify for standing in this matter are all current members who have been members of EDEN since at least August 17, 2024, the date that Plaintiff provided to Defendant the Notice Letter attached hereto as **Exhibit A.**

19.     Defendant's ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to Plaintiff and its current standing members.

20.     The relief requested herein will redress the ongoing injury in fact to Plaintiff and its members.

21.     Neither litigation of the claims asserted, nor the relief requested in this Complaint, will require the participation in this lawsuit of any individual members of EDEN.

## V.  **STATUTORY BACKGROUND**

22.     Congress declared that the Federal Clean Water Act was designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters through federal and state cooperation to develop and implement programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters. 33 U.S.C. §§ 1251(a), 1252(a)

23.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into Waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not

authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act.  33 U.S.C. § 1342

24.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to Dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water Dischargers. 33 U.S.C. § 1342(p)

25.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits in California.

Citizen Suit Provision of the CWA

26.    Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1)

27.    No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation to: (i) the Administrator of the EPA; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A)

28.    By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

29.    In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a).   Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation

occurring before November 2, 2015, $56,460.00 per day per violation for violations occurring after November 2, 2015; and $57,617.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI(Q(1)

30.     Violations of the provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4

A. **General Permit**

31.     The Water Board elected to issue a statewide General Permit for industrial storm water discharges.   Thus, the Permit under which this case arises is a federally required permit based upon California state substantive law.  *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016)

32.     The Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The Permit was reissued on April 17, 1997, and again on April 1, 2014 ("General Permit"), pursuant to Section 402(p) of the Clean Water Act. 33 U.S.C. § 1342(p)

33.     The current General Permit went into effect on July 1, 2015, after which it was amended again on November 6, 2018, with the revisions becoming effective on July 1, 2020. [See California's Industrial General Permit, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ, which is fully incorporated herein by reference.]

34.     A complete copy of the current General Permit Order is accessible at https://www.waterboards.ca.gov/water_issues/programs/storm_water/igp_20140057dwq.html

35.     The General Permit includes both absolute *discharge prohibitions* and substantive and procedural *standard condition* provisions.

36.     To discharge storm water lawfully in California, all industrial facilities discharging, or having the potential to discharge, storm water associated with industrial activity

("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing Permit Registration Documents, including a Notice of Intent to Discharge Storm water ("NOI") and an initial Storm Water Pollution Prevention Plan ("SWPPP") and Site Map.

37.    The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

### 1.  SMARTS Compliance Database

38.    The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where Dischargers enter and manage storm water data associated with General Permit compliance.

39.    SMARTS is readily accessible by the general public on the web; and the system is maintained primarily for the purpose of providing public access to allow citizens to monitor Dischargers' compliance with the General Permit and to pursue Dischargers who fail to comply, utilizing the citizen's suit provision of the CWA.

40.    SMARTS can be accessed at California Stormwater Multiple Applications and Report Tracking System.

41.    The General Permit requires Dischargers to certify (under penalty of law) and submit to SMARTS all Permit Registration Documents, including Notices of Intent to Discharge Storm Water, Storm Water Pollution Prevention Plans and Site Maps; monitoring and sampling data, Exceedance Response Reports and Annual Reports.  General Permit §§ I(A)(17), II(A)(1), II(B)(1), II(D), XI(B)(11)(a), XXI(K), XXI(L), Attachment D.

### 2.  Discharge Prohibitions of the General Permit

42.    The discharge related prohibitions of the General Permit include Effluent Limitation V(A) of the General Permit, which requires Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

43.     Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

44.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plans or the applicable Regional Water Board's Basin Plan.

**3.   Standard Conditions of the General Permit**

45.     In addition to discharge prohibitions, the General Permit contains a variety of substantive and procedural standard conditions.

46.     The General Permit requires that Dischargers comply with all standard conditions of the Permit and indicates that failure to comply with any standard condition of the General Permit constitutes an actionable, per se violation of the CWA, which comports with the provisions of 33 U.S.C. §1365(f)(7).  General Permit § XXI(A)

47.     The primary standard conditions of the General Permit include the following:

(a)     Continuously maintaining an accurate, up-to-date and compliant *SWPPP and Site Map*; implementing all provisions of the SWPPP, and certifying and submitting the SWPPP to SMARTS;

(b)     Implementing and maintaining *Best Management Practices*;

(c)     Conducting monthly and sampling event *visual observations*, contemporaneously completing observation reports and maintaining the reports for five years;

(d)     Collecting and analyzing *storm water runoff samples* four times per year;

(e)     Collecting the *storm water samples during qualified storm events, from all discharge locations, in all drainage areas* in places which are representative of industrial operations;

(f)  Testing the collected storm water samples for *all required parameters,* using the correct EPA test methods, and the prescribed sample holding times; and reporting the results to the Water Board within 30 days by certifying and submitting them to SMARTS;

(g)  Conducting *Annual Facility Compliance Evaluations* and contemporaneously preparing and retaining evaluation reports;

(h)  Preparing compliant *Exceedance Response Reports* in the event that storm water sampling data confirms an annual exceedance of any sampling parameter within the specified time limits, and certifying and submitting the reports to SMARTS;

(i)  Preparing complete and accurate *Annual Reports* and certifying and submitting them to SMARTS; and

(j)  Establishing a *Pollution Prevention Team* of at least two on-site employees and ensuring that the Team remains fully trained on all aspects of compliance with the General Permit.

### SWPPP and Site Map Requirements

48.  All Dischargers are required to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").

49.  The main objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the Discharger's facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

50.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised within ninety (90) days when there are routine revisions to be made; and within thirty (30) days whenever the SWPPP requires significant revisions. General Permit § X(B)

51.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP when necessary, is a violation of the General Permit. General Permit §§ I(J)(68), II(B)(3)(a), X(A), X(B), General Permit Fact Sheet § I(1)

52.     Among other requirements, the SWPPP must include: a detailed description of the facility's industrial processes and operations; identification of a pollution prevention team; a site map; a list of industrial materials handled and stored at the site, including the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency; a description of potential pollutant sources; an assessment of potential pollutant sources (specifically, whether the pollutants have the potential to commingle with storm water);  a monitoring implementation plan, including a discussion of facility drainage, drainage areas, and discharge points and sampling locations; all mandatory sampling parameters; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges.   General Permit §§ X(A)-X(I)

53.     The General Permit also requires that SWPPPs include detailed BMP Descriptions and a BMP Summary Table.  General Permit § X(H)(4), (5)

54.     Site Maps are required to depict the following: the facility boundary, storm water drainage areas, storm water flow direction, on-site surface water bodies and/or locations of nearby water bodies, municipal storm drain inlets that receive storm water discharges, locations of storm water collection and conveyance systems, associated discharge locations, sampling locations, locations and descriptions of structural control measures, identification of all impervious areas, locations where materials are directly exposed to precipitation, locations where significant spills or leaks have occurred, and all areas of industrial activity, including industrial storage areas.  General Permit § X(E)

Best Management Practices

55.     The General Permit requires all Dischargers to implement and maintain the following minimum Best Management Practices to reduce or prevent pollutants in industrial

storm water discharges at their facility: Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, and Quality Assurance and Record Keeping. General Permit § X(H)(1)

56.     The General Permit further requires Dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit § X(H)(2)

57.     Failure to implement minimum and advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. General Permit Fact Sheet §I(I)(2)(o)

<u>Monitoring and Reporting/Storm Water Sampling and Analysis</u>

58.     The General Permit requires Dischargers to develop and implement an adequate Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

59.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce storm water discharges, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

60.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

61.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

62.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload to SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §§ XI(B)(8), XI(B)(11)

63.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, all additional parameters indicated in the Permit by facility type (standard industrial classification code), and all parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit § XI(B)(6)(c)

64.     Facilities are also required to conduct monthly and sampling event visual observations.   Monthly visual observations are conducting during dry weather and must include observing each drainage area for the presence of non-storm water discharges; as well as inspecting outdoor industrial equipment and storage areas, outdoor industrial activities areas, and all other potential sources of industrial pollutants, and monitoring BMPs for effectiveness.  Sampling event visual observations are conducted at the same time as sampling occurs at a discharge location and must include observing storm water discharges for the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris and sources of any discharge pollutants.  General Permit § XI(A)

65.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair or contribute to impairing water quality or affect human health from ingestion of water or fish.

66.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks.  The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

67.     The NALs established under the General Permit for pollution parameters applicable to all Dischargers are set forth in Table 2 of the General Permit, which is incorporated herein by reference.

<u>NAL Exceedances-Exceedance Response Actions</u>

68.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than the annual NALs, which are listed on Table 2 of the General Permit.  The reporting year runs from July 1 to June 30.

69.     An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A), Table 2

70.     When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status" commencing July 1 of the reporting year following the entry into Level 1 status.

71.     Once a Discharger has entered Level 1 Status, by October 1 following commencement of Level 1 status, it must conduct a thorough facility evaluation with the assistance of a Qualified Industrial Stormwater Practitioner (QISP) of all drainage areas to determine the industrial pollutant sources at the facility that are or may be related to the exceedance(s), and identify the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future exceedances.   General Permit § XIII(C)

72.     By January 1 following commencement of Level 1 status, the Discharger must revise its SWPPP, implement any additional BMPs identified in the evaluation, and certify and

submit to SMARTS a Level 1 Exceedance Response Action (ERA) Report.  General Permit § XIII(C)

73.     If a discharger exceeds an applicable NAL during Level 1 Status, it is elevated to "Level 2 Status."  General Permit §XII(D)

74.     On January 1 of the reporting year following entry into Level 2 Status, a Discharger is required to submit to SMARTS a Level 2 ERA Action Plan identifying its selection of one of three options to remediate the continuing exceedances: implementation of additional BMPs, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  The Action Plan must also include a schedule for completion of the tasks.  General Permit § XII(D)(1)

75.     On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, the Discharger is required to submit a Level 2 Technical Report demonstrating its efforts to implement the additional BMPs or confirming the non-industrial sources of the pollutants causing the exceedances.  General Permit § XII(D)(2)

Annual Comprehensive Facility Evaluation

76.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit § XV

Annual Reports

77.     Section XVI(A) of the General Permit requires all Dischargers to certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year.

78.     Annual Reports are auto populated by SMARTS from Dischargers' answers to a series of twelve questions, which require mostly yes/no responses.

79.     The questions include whether the Discharger has conducted monthly visual observations, collected and analyzed the required number of storm water samples from all

discharge locations at its facility; and where the facility is located within an impaired watershed, the Discharger has assessed whether any of the receiving water impairments are potential pollutants present at their facility.

80.    Any "no" responses to the above questions require a complete and accurate explanation, certified under penalty of law.

<u>Certification of Compliance Documents</u>

81.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Party (LRP) or Duly Authorized Representative (DAR) of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

**B.    <u>Central Valley Region Basin Plan</u>**

82.    The Regional Water Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

83.    The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined

as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

84.    The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

85.    The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

86.    The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

87.    The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

88.    The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

89.    The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

90.    The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

91.    The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

92.    Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

## VI.  SPECIFIC FACTUAL ALLEGATIONS

### A.  The Facility

93.    Sweetener Products, located at 1150 Thurman Street in Lodi, California, is a Facility that manufactures and distributes sugar products and liquid sweeteners.

94.    Plaintiff is informed and believes that the facility falls under standard industrial classification ("SIC") code 2064-Candy and Confectionery Manufacturing, based on public records.  (See **Exhibit B**)

95.    SIC Code 2064 is included in Attachment A of the General Permit as a type of industrial operation that requires application for and receipt of General Permit coverage.

96.    Defendant stores and handles industrial chemicals and materials outdoors that are exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

97.    During rain events, storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the Facility settle onto the ground.

98.    Storm water flowing over these areas collects suspended sediment, dirt, metals, and other chemicals and toxic pollutants as it flows towards the Facility's storm water channels, and discharges from the Facility into its Receiving Waters.

99.    Based on the foregoing, Plaintiff alleges that Defendant is required to maintain standard General Permit coverage and is not eligible to apply for or receive either No Exposure Certification (NEC coverage) or Notice of Non-Applicability (NONA coverage).

**B.   The Facility's Receiving Waters**

100.    Based on Plaintiff's investigation, including but not limited to a review of the Defendant's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"); SWPPP and Site Map, aerial photography and drone footage; federal, state and local regulatory agency mapping tools; and eyewitness reports, storm water leaves the boundaries of Defendant's facility and enters Mokelumne River, via both the City of Lodi MS4 and surface flow.   Mokelumne River is a navigable Water of the United States.

101.    On April 10, 2015, Defendant certified under penalty of law to the Water Board and the general public via SMARTS that storm water discharges from the facility enter the Mokelumne River.  (See **Exhibit B**, attached hereto and incorporated herein by reference)

102.    Plaintiff alleges that the Best Management Practices at Defendant's facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to Waters of the United States.  (See **Exhibit E**)

**C.   Defendant's General Permit Violations**

Deficient SWPPP/Failure to Follow SWPPP

103.    Plaintiff alleges that since at least September 1, 2019, Defendant has failed to implement an adequate SWPPP for the facility and has failed to comply with the terms of its deficient SWPPP, in violation of the standard conditions of the General Permit.   General Permit §§ I(J), II(A)(1), II(B)(1)(b), II(B)(3), X, XXI(A), XXI(K)(1), XXI(L); General Permit Fact Sheet § II(I)(1); 33 U.S.C. § 1365(f)(7)

104.    Defendant's continuing failure to implement and follow an adequate SWPPP is evidenced by documents uploaded and certified to SMARTS under penalty of law by Sweetener Products, as well as by required documents which have not been uploaded to SMARTS.

105.    Defendant's continuing failure to implement an adequate SWPPP is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies.

106.     As is more particularly described in **Exhibit A,** attached hereto and incorporated herein by reference, Plaintiff's Notice Letter issued to Defendant delineated numerous deficiencies in Defendant's SWPPP and Site Map uploaded to SMARTS on August 3, 2022 ("former SWPPP").

107.     The 60-day notice period on Plaintiff's Notice Letter expired on October 16, 2024, without correction of any of the violations alleged in the Notice Letter.

108.     In anticipation of the filing of this lawsuit, and in a last-minute attempt to moot the alleged SWPPP deficiency violation, Defendant uploaded to SMARTS a revised SWPPP on November 12, 2024 ("current SWPPP").

109.     Defendant's November 12, 2024, SWPPP and Site Map remain deficient for failure to include the following:  (a) complete and accurate Pollutant Source Assessment and Industrial Material Inventory List [violation of General Permit §§ X(F), X(G) and XI(B)(6)]; (b) all mandatory sampling parameters [violation of General Permit § XI(B)(6)]; (c) sufficient detail regarding Facility operations and industrial processes [violation of General Permit § X(G)(1)]; and (d) accurate discussion and depiction of Facility drainage, discharge locations and sampling points [violation of General Permit §§  X(I) and X(G)(1)(e)].

110.     Plaintiff is informed and believes, and thereupon alleges, that neither Defendant's former nor current SWPPP include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

111.     According to information available to Plaintiff, neither Defendant's former nor its current SWPPP have been evaluated to ensure effectiveness and neither have been revised as required by the General Permit to reflect true conditions at the Facility and to prevent discharges of contaminated storm water.

112.     According to information available to Plaintiff, both Defendant's former and current SWPPP and Site Map contain misleading, false and insufficient information regarding facility operations and processes; drainage, drainage areas and storm water flow; discharge

locations and mandatory sampling points; the type, amount and location of industrial materials and chemicals handled at the facility; and all mandatory required sampling parameters associated with the facility's industrial materials and chemicals.

113.    Plaintiff alleges that Defendant's former and current SWPPP and Site Map do not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT.

114.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continue to fail to alter both the Facility's former and current SWPPP and Site Map and site-specific BMPs to comply with the requirements of the General Permit.

115.    In addition, Plaintiff alleges that Defendant has failed to comply with the provisions of its former and current SWPPP in the areas of monitoring and reporting.

116.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the Mokelumne River.

117.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendant's deficient SWPPP/Site Map are ongoing and continuous.

Monitoring and Reporting/ Storm Water Sampling

118.    Plaintiff alleges that Defendant's monitoring and reporting program is deficient and in violation of the mandatory standard conditions of the General Permit.  General Permit §§ X, X(I), XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii); 33 U.S.C. § 1365(f)(7)

119.    Defendant's deficient monitoring and reporting program is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

120.    Defendant's deficient monitoring and reporting program is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and

government agencies, as well as other relevant documents maintained by Defendant and governmental and regulatory agencies.

121.    Since September 1, 2019, Defendant has failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

122.    In addition, Defendant has failed to conduct monthly visual observations of storm water discharges at the facility since at least September 1, 2019.

123.    Defendant has also collected samples of storm water discharges at the facility that failed to comply with the General Permit's requirement that samples be preceded by a 48-hour period without a discharge, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

124.    Defendant has failed to collect storm water samples from each drainage area at all discharge locations at its facility, for each QSE where sampling is performed, pursuant to General Permit § XI(B), as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

125.    Defendant has failed to analyze the facility's storm water samples for all required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

126.    Defendant has failed to deliver the facility storm water samples to a qualified Laboratory within 48 hours of collection, pursuant to Attachment H, Section 2 of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

<u>Falsification of Annual Reports</u>

127.    Since September 1, 2019, Defendant has submitted inaccurate and/or falsified Annual Reports to the Regional Water Quality Control Board in violation of the standard conditions of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ II(A)(1),

XI(A)(C), XVI, XXI(K), XXI(L), XXI(N); General Permit Fact Sheet § II(O); 33 U.S.C. § 1365(f)(7)

128.    Defendant's submission of false Annual Reports and continuing failure to retract its false statements to the Water Board and the general public is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant.

129.    Defendant's submission of false Annual Reports is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

130.    Defendant's submission of false statements to the Water Board and the general public is ongoing and continuous.

Failure to Implement BAT/BCT; BMP Deficiencies

131.    Since at least September 1, 2019, Defendant has failed to identify and implement Best Management Practices ("BMPs") at the Facility which comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants.

132.    These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

133.    Defendant's failure to implement proper minimum BMPs is in violation of the standard conditions of the General Permit.   General Permit §§ I(C), V(A), X, XXI(A); General Permit Fact Sheet §§ II(I)(2)(o); 33 U.S.C. § 1365(f)(7)

134.    Defendant's BMP deficiencies are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

135.    Defendant's BMP deficiencies are also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

136.    Defendant's BMP deficiencies are more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

137.    As further evidence of Defendant's BMP deficiencies, Plaintiff has attached hereto as **Exhibit E** recent photographs of the Sweetener Products facility.

138.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the facility to the Mokelumne River.

<u>Failure to Comply with Required Exceedance Response Actions</u>

139.    Since September 1, 2019, Defendant has failed to comply with required Exceedance Response Actions, in violation of both the discharge prohibition and standard conditions of the General Permit.  General Permit §§ I(D), I(C), I(K)(70), I(K)(77), III, V(A), VI, X, X.I, XI, XII, XXI(A); 33 U.S.C. § 1365(f)(7)

140.    Defendant's failure to comply with the General Permit's required Exceedance Response Actions is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

141.    On July 1, 2017, Defendant was elevated to Level 1 Status for exceedances of Chemical Oxygen Demand which occurred during the 2016-17 reporting year.

142.    On July 1, 2022, Defendant was again elevated to Level 1 Status for exceedances of Chemical Oxygen Demand which occurred during the 2021-22 reporting year.

143.    Pursuant to Section XII of the General Permit, Defendant's Level 1 Exceedance Response Action (ERA) Report was due to be prepared and uploaded into SMARTS by January

1, 2018; and its second Level 1 ERA Report was due to be prepared and uploaded to SMARTS by January 1, 2023.

144.    Defendant's Level 1 ERA Reports certified and submitted to SMARTS on November 16, 2017, and December 21, 2022, were deficient, as detailed in Plaintiff's Notice Letter attached hereto as **Exhibit A**.

145.    While the facility's initial Level 1 ERA Report first became due on January 1, 2018, Defendant's obligation to prepare and upload a compliant ERA Report to SMARTS has never been extinguished.

146.    As is evidenced by Section I(K)(77) of the General Permit and the Compliance Flow Chart extracted from the General Permit (attached hereto as **Exhibit D** and incorporated herein by reference), failure to submit a compliant Level 1 ERA Report following annual average exceedances of any sampling parameter is a per se violation of the General Permit that continues until the required Report is prepared and submitted to SMARTS.

147.    To date, Defendant has failed to prepare and submit to SMARTS a sufficient Level 1 ERA Report for its exceedances of Chemical Oxygen Demand, which Plaintiff alleges is a continuing ongoing violation of both the discharge prohibitions and the standard conditions of the General Permit, which violations Plaintiff alleges have been in effect since September 1, 2019.

Discharges of Contaminated Storm Water

148.    Since at least September 1, 2019, Defendant has discharged contaminated storm water from its facility in violation of the absolute discharge provisions and the standard conditions of the General Permit, as is more particularly described herein, as well as in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ I(D), I(C), I(K)(77), III, V(A), VI, X, X.I, XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii), II(I)(2)(o), II(K)(2)(b); 33 U.S.C. § 1365(f)(7)

149.    Defendant's discharges of contaminated storm water in violation of the General Permit are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

150.    Defendant's discharges of contaminated storm water in violation of the General Permit are also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

151.    Information available to Plaintiff indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

152.    Due to the nature of the operations at Defendant's facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendant is discharging storm water containing excessive levels of pollutants specific to its operation during at least every significant local rain event.

153.    Defendant has repeatedly failed and refused to include accurate information in the Facility's SWPPP regarding industrial operations, processes and materials, as well as locations where sampling and monitoring are required; and Defendant has failed to test Facility storm water runoff samples for all required parameters, resulting in unmonitored pollutants freely flowing from the Facility into the Mokelumne River and its tributaries.

154.    Specifically, Plaintiff is informed and believes, and on that basis alleges, that the unmonitored pollutants being discharged by the Facility include Chemical Oxygen Demand (COD), Biochemical Oxygen Demand (BOD), Iron, Zinc and Total Petroleum Hydrocarbons (TPH).

155.    In addition, Defendant's self-monitoring Ad Hoc Reports evidence certified and submitted to SMARTS evidence exceedances of monitored parameters, including Chemical

Oxygen Demand (COD), as is more particularly described in Plaintiff's Notice Letter attached hereto as **Exhibit A**.

156.    While exceedances of the Numeric Action Limits set forth in Table 2 of the General Permit (attached hereto as **Exhibit C**) are not in and of themselves violations of the General Permit, when coupled with BMP deficiencies and/or violations of the required Exceedance Response Actions, the exceedances are transformed into per se violations of the General Permit.   (See **Exhibit D**, Compliance Flowchart; General Permit §§ I(K)(70), I(K)(77), V(A), XII; General Permit Fact Sheet §§ II(I)(3)(a)(iii), II(I)(2)(o), II(K)(2)(b)

157.    As set forth above, Defendant has failed to comply with required Exceedance Response Actions and has failed to implement and maintain required Best Management Practices.

158.    Defendant's discharges of contaminated storm water in violation of the General Permit is ongoing and continuous.

Failure to Train Employees

159.    Since at least September 1, 2019, Defendant has failed to implement and train a Pollution Prevention Team at the facility, in violation of the standard conditions of the General Permit.   General Permit §§, I(K)(70), I(K)(77), I(I)(63), IX(A)(3), X(D), XXI(A), 33 U.S.C. 1365(f)(7)

160.    The General Permit requires all Dischargers to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

161.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

162.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies.

163.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is also evidenced by Defendant's ongoing and continuing General Permit violations.

164.    In addition, Defendant was required to have a Qualified Industrial Stormwater Practitioner (QISP) conduct training of the Facility's Pollution Prevention Team after it entered Level 1 Status on July 1, 2017, and to date has failed to do so.

165.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is ongoing and continuous.

**D. <u>Information Injuries Caused by Defendant's General Permit Violations</u>**

166.    In addition to harming the aesthetic and recreational interests of Plaintiff's members with standing in this matter, Defendant's violations of the standard conditions of California's Industrial General Permit have caused informational injuries to EDEN's standing members by depriving these members of their substantive constitutional and statutory rights to obtain information regarding Defendant's compliance with standard conditions of California's Industrial General Permit, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

167.    As set forth in more detail herein, Defendant has failed and refused to comply with all mandatory standard conditions of the General Permit, including maintaining a deficient SWPPP which includes objectively false information related to drainage, outdoor handling of industrial materials and storm water flow/sampling locations; failing to collect and analyze the required number of storm water samples; failing to test storm water samples for the proper parameters; and providing incomplete and false information in Annual Reports.

168.    Defendant's failure to comply with the standard conditions of the General Permit as set forth above have prevented Plaintiff's members with Article III standing from: (a) accessing on SMARTS the true operational facts relevant to Defendant's facility; and (b) acquiring accurate and complete data related to the unmonitored pollutants emanating from Defendant's facility during rain events and discharging into the facility's Receiving Waters.

169.    As such, Plaintiff's members with Article III standing are unable to fully assess the extent of Defendant's General Permit violations, as well as the types and levels of pollutants entering the affected waterways due to Defendant's willful violations of the standard conditions of the General Permit; or to even gauge the potential health ramifications to themselves should they continue to recreate in the affected waterways.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

170.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

171.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP, including a Site Map.

172.    As outlined herein, Defendant has failed to develop and implement an adequate SWPPP for its facility.

173.    Each day since September 1, 2019, that Defendant has failed to develop, implement and update an adequate SWPPP for the facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

174.     These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and upload to SMARTS a compliant SWPPP and Site Map.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

175.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

176.    The General Permit requires Dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

177.    As outlined herein, Defendant has failed to develop and implement an adequate monitoring and reporting program for the Sweetener Products facility.

178.    Each day since at least September 1, 2019, that Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

179.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop and implement a compliant monitoring and reporting program.

**THIRD CAUSE OF ACTION**
**Submission of False Annual Reports to the Regional Water Board**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

180.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

181.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information. As delineated herein, Defendant made

false representations in the Facility's Annual Reports and has failed to correct or retract the false statements.

182.    Each time since September 1, 2019, that Defendant submitted false or misleading statements to the Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

183.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's failure to withdraw any of the false Reports submitted to the Water Board.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

184.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.  The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of Best Management Practices (BMPs), including Best Available Treatment (BAT) for toxic and nonconventional pollutants and Best Conventional Treatment (BCT) technologies for conventional pollutants.

185.    As alleged herein, Defendant has failed to implement BAT and BCT at the facility for its discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

186.    As alleged herein, Defendant has failed to implement the required minimum Best Management Practices at the Facility.

187.    Each day since at least September 1, 2019, that Defendant failed to implement the required minimum BMPs and to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

188.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and maintain adequate BMPs at its Facility.

### FIFTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

189.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

190.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

191.    Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

192.    Plaintiff is informed and believes, and thereupon alleges, that since at least September 1, 2019, Defendant has been discharging polluted storm water from its facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

193.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants, becoming contaminated with pollutants associated with the industrial activity occurring at Defendant's facility.   The polluted storm water then flows untreated into the Mokelumne River.

194.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

195.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit. Furthermore, discharges of pollutants in excess of EPA benchmark values set forth in Table 2 of the General Permit (attached hereto as **Exhibit C**) are in violation of the General Permit when either (a) the Discharger has failed to comply with required Exceedance Response Actions; and/or (b) the Discharger has failed to implement and maintain required Best Management Practices.  **Exhibit D**, Compliance Flowchart; General Permit §I(K)77)

196.    As alleged herein, Defendant has failed to comply with required Exceedance Response Actions and has failed to implement and maintain required Best Management Practices.

197.    Every day since at least September 1, 2019, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act.  33 U.S.C. § 1311(a)

198.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and maintain adequate minimum BMPs at its Facility; failure to comply with required monitoring and reporting provisions of the General Permit; and failure to prepare and upload to SMARTS a compliant Level 1 Exceedance Response Report.

## SIXTH CAUSE OF ACTION
### Failure to Comply with Required Exceedance Response Actions
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

199.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

200.    The General Permit requires that all Dischargers who enter Level 1 or Level 2 status comply with specific Exceedance Response Actions delineated in Section XII of the General Permit.

201.    As herein alleged, Defendant Sweetener Products has failed to date to comply with the Exceedance Response Actions required by the General Permit.

202.    Each day since September 1, 2019, that Defendant has failed to comply with the Exceedance Response Actions required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

203.    This violation is ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to prepare and upload to SMARTS a Level 1 Exceedance Response Report, which violation renews every day until the Report has been submitted.

## SEVENTH CAUSE OF ACTION
### Failure to Properly Train facility Employees and Pollution Prevention Team
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

204.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

205.    Section X(D)(1) of the General Permit requires each facility to establish a Pollution Prevention Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

206.    Section X(H)(f) of the General Permit also requires that Dischargers ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained.

207.    Since at least September 1, 2019, Defendant has failed to properly implement and train a Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendant to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendant to immediately operate the Sweetener ProductsSweetener Products facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.    Enjoin Defendant from discharging pollutants to the surface waters surrounding its facility until such time as Sweetener Products has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.    Order Defendant to pay civil penalties of $57,617.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.    Order Defendant to take appropriate actions to restore the quality of United States waters impaired by activities at its facility;

6.    Order Defendant to pay Plaintiff's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

8.      Award such other and further relief as may be just and proper.

Dated:  January 8, 2025                              Respectfully,

                                        By:  ___*/S/ Adam D. Brumm*_____
                                              Adam D. Brumm
                                              Attorney for Plaintiff